IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **EUGENE PIRTLE,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| vs. | ) CIVIL NO. 04-603-GPM |
| | ) |
| **JO ANNE B. BARNHART,** | ) |
| **Commissioner of Social Security,** | ) |
| | ) |
| **Defendant.** | ) |

# MEMORANDUM AND ORDER

**MURPHY, Chief District Judge:**

In accordance with 42 U.S.C. § 405(g), Plaintiff Eugene Pirtle seeks judicial review of the June 25, 2004, final agency decision denying him a period of disability, disability insurance benefits (DIB), and supplemental security income (SSI).

### PROCEDURAL HISTORY

Eugene Pirtle filed an application for DIB and SSI on October 27, 2000, alleging disability beginning on July 1, 2000. (Tr. 76) Pirtle later testified that the correct date of onset was in 1998. (Tr. 518)

The application was denied initially and on reconsideration. Pirtle requested a hearing, which was held before Administrative Law Judge (ALJ) Thomas C. Muldoon. (Tr. 474-501) ALJ Muldoon denied the application for benefits in a decision dated December 30, 2002. (Tr. 34-36, 60-65)

The Appeals Council granted Pirtle's request for review on May 15, 2003, and remanded the

case to the ALJ with specific directions. (Tr. 73-75) Another hearing was held on November 17, 2003. (Tr. 502-522) ALJ Muldoon again denied the claim in a decision dated February 11, 2004. (Tr. 16-24) Pirtle's request for review was denied by the Appeals Council on June 25, 2004, and the decision of the ALJ became the final agency decision. (Tr. 5-7) Pirtle exhausted his administrative remedies and filed a timely complaint in this district court.

### ISSUES RAISED BY PIRTLE

Pirtle raises the following points:

1. The ALJ's finding that Pirtle's impairment did not meet or exceed a listing was erroneous because he did not consider the effects of his obesity, he found that Pirtle did not suffer from carpal tunnel syndrome, and he failed to consider the side effects of Pirtle's medications.

2. The ALJ's finding that Pirtle's testimony was not credible was not supported by substantial evidence.

3. The ALJ's finding that Pirtle was able to return to his past relevant work was not supported by substantial evidence.

4. The ALJ's alternative finding that Pirtle has the ability to do a full range of light or sedentary work was not supported by substantial evidence.

### THE EVIDENTIARY RECORD

The Court has reviewed and considered the entire record in formulating this Memorandum and Order. The following is a summary of the pertinent portions of the written record.

**1. The First Hearing – November 20, 2002.**

Pirtle, who was represented by counsel, was forty-five years old at the time of the first hearing. (Tr. 476) He is able to read and write, but he testified that he reads slowly and has some difficulty comprehending what he reads. (Tr. 478) His previous work was as a janitor for a Methodist Church organization, the Lessie Bates Davis Neighborhood House, Inc., from 1983 to

1998. (Tr. 90, 478-479)  His work activities included mopping and sweeping floors, dusting, cleaning, stripping floors, and setting up chairs for meetings. *Id.*

Pirtle classified his job as medium work.  He testified he would be unable to perform that work today because he has problems with his right shoulder and right forearm. (Tr. 480)  He also has problems with his left foot, hip, thigh, and shoulder.  He is diabetic, has a heart problem, and high blood pressure. (Tr. 480, 484)

Pirtle changed jobs in 1997 because, according to his testimony, he was having a problem getting along with someone. (Tr. 494)  He was given a "leave of absence" and never returned.  His unemployment application was denied. (Tr. 497)

Pirtle got another janitorial job through an employment agency, but he suffered an injury to his right shoulder on that job in 1998 and has not worked since. (Tr. 482)  He testified that he lasted on his new job for about a week and a half and then developed carpal tunnel syndrome. (Tr. 494)  Pirtle's new job involved using a "correlator type machine" which involved repetitious motion of his hands. (Tr. 498)

There was a period of time when Pirtle could not afford medication.  At the time of the first hearing, Pirtle was taking two medications for diabetes, three blood pressure medications, Ibuprofen (800 mg) and Naproxen for pain, Zocor for cholesterol, and a diuretic. (Tr. 485-490)  He was able to afford the medications because he got assistance from an agency in East St. Louis. (Tr. 490)

Pirtle testified that a heel spur in his left heel causes a shooting pain up to his thigh when he walks.  He was told he needs surgery, but he cannot afford it. (Tr. 491)  The pain in his right arm bothers him more than the left leg. (Tr. 492)

Pirtle gets up around 7:30 a.m. (Tr. 492)  He tries to fix himself a meal.  His sister, who is

also diabetic, prepares most of his meals. His niece does the housework and laundry. He does nothing around the house because he is in "constant pain." (Tr. 493)

2.      **The Second Hearing – November 17, 2003**.

Pirtle testified that he has not done any work activity since approximately September 1998. (Tr. 506) According to him, his date of disability should be 1998, not 2000. (Tr. 518) He also testified that he has a couple of years of college credit. (Tr. 519)

Pirtle testified that he has constant pain in his right hand for which he takes pain medication, including Ibuprofen (800 mg), a muscle relaxer, and over-the-counter Aleve. (Tr. 506-507) The pain feels like he is being stuck with a pin and affects his right thumb, index finger, and little finger. (Tr. 507) The pain keeps his hand "locked" in a semi-flexed position. (Tr. 508) He has trouble holding certain things. (Tr. 510)

At the second hearing, Pirtle testified that he left his long time employer because he was looking for a better job, "trying to just basically better my abilities and using them for something." (Tr. 512) He testified that he left his last employer after a couple of weeks because he was "having problems with my hand and some other things that occurred during the job." (Tr. 513)

Pirtle testified that he experienced chest pain in July 2003 and that a stent was placed in his artery. Since that time, he has chest discomfort every other day. (Tr. 513-514) He takes a medication for his heart called Plavix. (Tr. 515) He was also prescribed nitroglycerin but had to discontinue it because it gave him headaches. (Tr. 516-517) The only side effect of the other medications is dizziness on "certain days." (Tr. 516)

3.      **Medical Records**.

Pirtle's application for benefits indicated a disability date of July 1, 2000. (Tr. 461) In his

Disability Report, filled out on October 27, 2000, he stated he was disabled due to a heart condition, a right hand injury, diabetes, and high blood pressure.

Pirtle was treated at Deaconess MedCenter in Fairview Heights, Illinois, in 1998 for right arm complaints. He gave a history of onset of pain and swelling in his right wrist while at work on August 25, 1998. (Tr. 278) Exam showed some swelling of the wrist and painful range of motion of the thumb. An x-ray was negative. (Tr. 279) He was given a sling and an Ace wrap and told to use cool compresses and to take Ibuprofen. (Tr. 280)

Pirtle was seen again on August 31, 1998. Examination showed improvement with decreased pain and swelling. He had a full range of motion of the wrist and elbow without pain. It was noted that his blood pressure was high and that he stated he did not have a doctor to see. He was placed on medication and instructed to see a doctor and to report to the emergency room if he had symptoms. (Tr. 275)

On September 3, 1998, he returned complaining that the pain was worse and was shooting from his forearm to the elbow to the shoulder. There was no swelling of the wrist or elbow, and the wrist had a full range of motion. The elbow was tender. The right shoulder was said to be negative. (Tr. 271)

Pirtle was seen by Harlen Hunter, D.O., for his right arm complaints. On September 8, 1998, Dr. Hunter noted that his "discomfort" did not "line up in an [sic] radicular pattern" (Tr. 338). Pirtle had marked tenderness on palpating C4-C5 on the right, and Spurling compression tests caused discomfort in the right shoulder. Cervical range of motion was not restricted. The Phalen test and Tinel's sign were negative. X-ray of the neck showed arthrosis at C5-C6. Dr. Hunter sent Pirtle for two weeks of physical therapy. (Tr. 338)

On September 22, 1998, Dr. Hunter noted that an MRI showed a bulging disc at C5-C6, with no impingement of the dural sac. He described these results as "essentially normal." Dr. Hunter recommended two weeks of therapy and then "return to work without restrictions." (Tr. 338)

Pirtle continued to complain of soreness in his right arm with stiffening of his hand. Dr. Hunter sent him to Dr. Routsong for a neurosurgical consultation. (Tr. 339) Rodney Routsong, D.O., examined Pirtle on November 17, 1998. He found that there were no signs of cervical radiculopathy or myelopathy but noted diffused swelling in the right hand. Dr. Routsong stated that Pirtle may be demonstrating mild intermittent nerve symptoms at the carpal tunnel but did not recommend surgery and described this as "quite minimal." (Tr. 330-332)

Pirtle then returned to Dr. Hunter, who noted that Dr. Routsong stated his problem was "cervical strain with a right biceps tendonitis." (Tr. 340) Dr. Hunter recommended conservative care. On December 1, 1998, Dr. Hunter released Pirtle to return to work with the restriction of not looking or working above shoulder height. (Tr. 340) Dr. Hunter then referred Pirtle to Dr. Creighton for epidural injections in his cervical area. (Tr. 340)

On February 13, 1999, Pirtle appeared in the emergency room at Memorial Hospital in Belleville, Illinois, complaining of low back pain. The medical record notes that he was receiving injections and states "unclear why seeking ER care today." (Tr. 287-288) Pirtle's blood pressure was high, and he was given medication and counseled to follow up with his doctor; he was also given Darvocet for pain. (Tr. 293)

The records reflect no further treatment in 1999.

On March 13, 1999, however, Russell Cantrell, M.D., examined Pirtle at the request of his employer in connection with his worker's compensation claim. Pirtle told Dr. Cantrell that he had

been off work since the date of his injury, *i.e.*, August 1998. Among his findings, Dr. Cantrell stated that there was no atrophy or swelling and that Tinel's sign was negative. The wrist and elbow range of motion were full. Pirtle showed limitation of active range of motion of both shoulders, although the left shoulder had no symptoms. (Tr. 364) After a review of the medical records and physical exam, Dr. Cantrell concluded that "his subjective complaints of diffuse right upper extremity pain are not explainable in my opinion based on anatomic pathology." He further stated that "I feel that some of his persistent subjective pain complaints are magnified in nature." Dr. Cantrell concluded that Pirtle needed no further medical treatment for his right arm, had no permanent disability, and could return to work. (Tr. 365)

Pirtle's attorney sent him to be evaluated by Bruce Schalfly, M.D., on December 28, 1999. In contrast to Dr. Cantrell, Dr. Schlafly found limited range of motion of the right wrist and elbow and positive Tinel's sign. (Tr. 356-357) Dr. Schlafly diagnosed carpal tunnel syndrome and recommended surgery. He opined that if Pirtle did not get the surgery he would be left with a "substantial permanent partial disability" of the right hand and arm. (Tr. 358)

Dr. Schlafly examined Pirtle again on March 31, 2003, after the Appeals Council remanded the case. Pirtle had not received further treatment for his right hand. He had limited range of motion of the hand but no atrophy. On this exam, Tinel's sign was negative. Dr. Schlafly noted that his findings this time "are somewhat different" and stated that Pirtle "does not have a routine, straightforward case of carpal tunnel syndrome." (Tr. 404) He recommended electrical studies of the hands and arms. *Id.*

In October of 2000, Pirtle was treated for cardiac problems at Barnes-Jewish Hospital in St. Louis, Missouri. He presented in the emergency room on October 20, 2000, complaining of blurred

vision, thirstiness, urinary frequency, and abdominal pain for several days. His blood sugar and blood pressure were high. (Tr. 372-379) He was admitted to the hospital. He had some chest discomfort, and, after a positive stress test, he had cardiac catheterization which showed moderate two vessel coronary artery disease. (Tr. 194-195) He was discharged on October 25, 2000, and told to follow up with his doctor. He was prescribed medications for his blood pressure, blood sugar, cholesterol, and told to take aspirin for his heart. (Tr. 197-205)

On January 29, 2001, Pirtle was seen again in the emergency room at Barnes-Jewish Hospital after experiencing a syncopal episode in which he "blacked out" for about two seconds while driving at approximately 2:00 a.m. He indicated that he had not been taking his medications because he had not been approved for Medicaid at that point. (Tr. 219) His blood sugar was high. The records state that it was unclear whether this was truly a syncopal episode, and he may have simply fallen asleep at the wheel. (Tr. 220) The admission history and physical notes that Pirtle stated that he "does not work but spends his days taking care of his daughters." (Tr. 223)

On November 15, 2001, Pirtle was seen in the emergency room at St. Mary's Hospital in East St. Louis, Illinois, for uncontrolled high blood sugar. He had not been taking medication because he was unable to afford it. (Tr. 455)

Pirtle was treated by Dr. Ampadu beginning on April 2, 2002, for high blood pressure and diabetes. On April 2, 2002, he complained of left knee pain. (Tr. 443) On September 18, 2002, he complained of left heel pain, which was diagnosed as a heel spur. (Tr. 446, 460) On October 30, 2002, he complained of left hip pain, which was diagnosed as osteoarthritis, as well as left heel pain, along with high blood pressure. (Tr. 447)

Pirtle had an acute myocardial infarction on July 20, 2003. He was hospitalized at Barnes-

Jewish Hospital. (Tr. 407-410) He had no spinal tenderness. His grip strength on the right was 3+ to 4+. Tinel's sign was questionable on the right. (Tr. 409) Cardiac catheterization showed severe coronary artery disease. Successful angioplasty with stenting of the mid right coronary artery was performed. (Tr. 435-437) The results were described as "excellent" with "complete resolution of chest discomfort." (Tr. 436)

Thereafter, Pirtle continued to be seen by Dr. Ampadu. On November 19, 2003, he was "doing well" with no chest pain or shortness of breath. (Tr. 453)

**4.     State Agency Physician Evaluations.**

State agency physicians reviewed Pirtle's medical records and evaluated his residual functional capacity in 2001. They concluded that Pirtle could lift 50 pounds occasionally and 25 pounds frequently, could stand/walk 6 out of 8 hours, could sit 6 out of 8 hours, and had no limitation on his ability to climb, balance, stoop, kneel, crouch, and crawl. They found no manipulative, visual, communicative, or environmental limitations. They noted that loss of grip strength was not supported by objective findings and concluded that he was able to perform medium work. (Tr. 245-252)

**5.     Disability Determination Services Examinations.**

Stanley Rabinowitz, M.D., examined Pirtle on January 18, 2001. (Tr. 212-215) Pirtle gave a history of hypertension, diabetes, and occasional chest pain for the past three years. He also complained of right shoulder and arm pain with occasional numbness and tingling in the hand. He was able to perform routine activities of daily living. Subjective grip strength on the right was 50% of normal. He held his right hand closed "for reasons which are unclear." (Tr. 214) The doctor stated that the limited grip strength and digital dexterity "appeared out of proportion to the objective

findings present." (Tr. 215) There was no evidence of motor weakness, atrophy, or sensory impairment. *Id.*

Naseem Shekhani, M.D., examined Pirtle on August 26, 2001. (Tr. 268-270) He noted no difficulty in doing activities of daily living. The range of motion in all joints was normal. He had normal motor strength, grip, and pinch. Pirtle had tenderness in the paralumbar area. Dr. Shekhani concluded that he had no problems in sitting, standing, or walking. Pirtle was able to grasp and had normal finger manipulation. He was able to handle objects up to 25-50 pounds.

## APPLICABLE STANDARDS

To qualify for disability insurance benefits, a claimant must be "disabled," which is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A). A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. 42 U.S.C. §§ 423(d)(3) and 1382c(a)(3)(C).

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled. In essence, it must be determined (1) whether the claimant is presently employed; (2) whether the claimant has an impairment or combination of impairments that is severe; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education

.

and work experience.  *See Schroeter v. Sullivan*, 977 F.2d 391, 393 (7th Cir. 1992); *Pope v. Shalala*, 998 F.2d 473, 477 (7th Cir. 1993); 20 C.F.R. § 404.1520(b-f).

If the Commissioner finds that the claimant has an impairment which is severe and he is not capable of performing his past relevant work, the burden shifts to the Commissioner to show that there are a significant number of jobs in the economy that the claimant is capable of performing. *See Bowen v. Yuckert*, 482 U.S. 137, 146 (1987); *Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995.

It is important to keep in mind the proper standard of review for this Court.  42 U.S.C. § 405(g) states that "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ."  Thus, the Court must determine not whether Pirtle was, in fact, disabled during the alleged period, but whether the ALJ's findings were supported by substantial evidence, and, of course, whether any errors of law were made.  *See Books v. Chater*, 91 F.3d 972, 977-978 (7th Cir. 1996) (citing *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995)).  In reviewing the ALJ's decision denying benefits, the Court's focus is on whether the ALJ's decision is supported by substantial evidence in the record, and not on whether a different decision could have been reached.  *Henderson v. Apfel*, 179 F.3d 507, 512 (7th Cir. 1999).

The Supreme Court has defined substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971).  In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court *does not* reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ.  *Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997); *Kepple v. Massanari*, 268 F.3d 513, 516 (7th Cir. 2001).

#### ANALYSIS

ALJ Muldoon properly followed the framework of the five-step analysis described above. He found Pirtle suffers from poorly controlled diabetes and hypertension due to noncompliance and that he has coronary artery disease which has been treated with angioplasty. He also found that there is no credible evidence of carpal tunnel disease. He found Pirtle's allegation of impairments not credible. Lastly, he found that Pirtle has the residual functional capacity to perform the requirements of his past relevant work as a maintenance supervisor and that he is, therefore, not disabled. (Tr. 23)

Pirtle takes issue with the ALJ's credibility determination. All of Pirtle's points involve to some degree the correctness of the credibility determination.

The credibility findings of the ALJ are to be accorded deference, particularly in view of the ALJ's opportunity to observe the witness. *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). Social Security regulations and Seventh Circuit cases "taken together, require an ALJ to articulate specific reasons for discounting a claimant's testimony as being less than credible, and preclude an ALJ from 'merely ignoring' the testimony or relying solely on a conflict between the objective medical evidence and the claimant's testimony as a basis for a negative credibility finding." *Schmidt v. Barnhart*, 395 F.3d 737, 746-747 (7th Cir. 2005), and cases cited therein.

Here, the ALJ pointed out two glaring discrepancies in Pirtle's testimony. First, Pirtle's earnings records reveal that he had substantial earnings in years in which he testified that he did not work at all. (Tr. 18) Pirtle testified that he had not done any work since he left "the mission" in 1998 and that he felt his actual date of disability was in 1998, despite the fact that his application for benefits listed July 1, 2000. (Tr. 518)

Pirtle's employment records reveal that in 1999 he had income of $19,942.00 from Cedars,

Inc. In 2000, he had income totaling $18,188.31 from two employers: Cedars, Inc., and Panera, Inc. In 2001, he had income totaling $9,768.75 from four employers: Panera, Inc., Strobe Enterprises, Inc., Building One Commercial, Inc., and TRC Staffing Services. (Tr. 106-107)

Pirtle's brief makes no attempt at all to explain this obvious discrepancy. Rather, he suggests that, on remand, "additional evidence should be given to resolve any discrepancy." (*See* Doc. 13, p. 32.) His testimony is clear that he did not work after 1998. Pirtle offers no suggestion as to what kind of evidence could possibly be offered to resolve the issue.

The ALJ also noted a discrepancy in Pirtle's testimony about the reason he left his long-time employer, Lessie Bates Davis Neighborhood House. (Tr. 21) Although the ALJ was inaccurate in his description of the discrepancy, there is no doubt that Pirtle gave conflicting testimony about why he left that job. Pirtle testified that he left his long-time employer in 1997 because, after he was transferred to another location, he had problems getting along with someone, described only as "a female," and experienced stress because of that situation. Instead of firing him outright, he was given a "leave of absence" from which he would not return. His unemployment application was denied. (Tr. 496-500) At the second hearing, however, Pirtle testified that he left his long-time employer because he was looking for a better job, "trying to just basically better my abilities and using them for something." (Tr. 512) He denied that he left due to any problems on the job, calling it a "friendly leaving." (Tr. 512)

Again, Pirtle's brief makes no attempt to explain or resolve this obvious contradiction in his testimony. In view of these serious contradictions, the Court must conclude that the ALJ's finding that Pirtle's testimony was not credible is supported by substantial evidence.

Pirtle argues that the ALJ's finding that his impairment did not meet or exceed a listing was

erroneous because he did not consider the effects of Pirtle's obesity, erroneously found that Pirtle did not suffer from carpal tunnel syndrome, and failed to consider the side effects of his medication.

Pirtle "bears the burden of proving his condition meets or equals a listed impairment." *Maggard v. Apfel*, 167 F.3d 376, 380 (7th Cir. 1999). He has not done so. He does not even suggest which listing he believes he meets.

Pirtle points to no evidence that his obesity in fact has any additional or cumulative effect on his condition, and this Court's review of the record revealed no such evidence. "When an applicant for social security benefits is represented by counsel the administrative law judge is entitled to assume that the applicant is making his strongest case for benefits." *Glenn v. Secretary of Health and Human Services*, 814 F.2d 387, 391 (7th Cir. 1987). Pirtle had two hearings before the ALJ and ample opportunity to present all the evidence he wished to have considered. Pirtle had the responsibility to provide medical evidence showing that he has an impairment and the severity of that impairment. 20 C.F.R. § 416.912. He has not presented any evidence that his obesity had any effect on his impairment.

The situation is similar with respect to side effects of medication. Pirtle testified that he stopped taking nitroglycerin due to headaches. He presented no evidence that his not taking nitroglycerin affected his ability to work, however, and the record indicates that he did not suffer chest pain after the stenting. (Tr. 436, 453) With regard to his regular medications, Ibuprofen, Aleve, and Plavix, Pirtle's attorney asked him if he had side effects, and he replied that "Well, if, it has me dizzy on certain days. Certain days, I'm dizzy if I don't sit down and –" (Tr. 516-517). There was no other testimony about side effects, and the medical records do not contain any complaints about side effects. Pirtle presented no evidence to suggest that side effects of his

medication contributed in any way to causing his condition to meet the requirements of a listed impairment.

Secondly, two state agency physicians determined that Pirtle's impairments do not meet or equal the requirements of a listed impairment. (Tr. 245-252) State agency physicians are designated to determine medical equivalence. *See* 20 C.F.R. § 404.1526(b). The ALJ is entitled to rely on the opinion of a state agency physician as to whether a listed impairment has been met. *See Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004). The finding that Pirtle did not meet or exceed a listed impairment is supported by substantial evidence.

Pirtle also asserts that the finding at step 3 was erroneous because the ALJ did not find that he suffered from carpal tunnel syndrome or some other impairment of his right arm and hand. In finding that Pirtle does not have a severe impairment of his upper right extremity, the ALJ rejected the opinion of Dr. Schlafly. (Tr. 19) Dr. Schlafly did not treat Pirtle; he examined Pirtle at the request of Pirtle's attorney. (Tr. 483) He is not a treating source, and his opinion is not entitled to controlling weight. *White v. Barnhart*, 415 F.3d 654, 658 (7th Cir. 2005).

Of all the doctors who examined or treated Pirtle, only Dr. Schlafly opined that he had carpal tunnel syndrome serious enough to require treatment. Dr. Harlan did not believe that he had carpal tunnel syndrome at all. Dr. Routsong concluded that he might be demonstrating mild intermittent nerve symptoms at the carpal tunnel, but stated it was "quite minimal" and did not require surgery. (Tr. 330-332) Dr. Cantrell found no atrophy or swelling, and the Tinel's sign was negative. He stated that Pirtle's "subjective complaints of diffuse right upper extremity pain are not explainable in my opinion based on anatomic pathology," and he felt that some of Pirtle's complaints of pain were "magnified in nature." Dr. Cantrell concluded that Pirtle needed no further medical treatment

for his right arm, had no permanent disability, and could return to work. (Tr. 365)

In addition, as the ALJ noted, Dr. Schlafly's findings on the second exam were somewhat different from his findings on the first exam. (Tr. 19) On the second exam, for example, Tinel's sign was negative. (Tr. 404) Dr. Schlafly remarked that he did not think that Pirtle has a "routine, straightforward case of carpal tunnel syndrome." *Id.* Pirtle has not had any surgery on his right arm because "the insurance carrier has refused." (Tr. 483-484)

In short, there is a conflict in the medical evidence as to whether Pirtle has a severe impairment of his right arm. Dr. Schlafly thinks that he does, and the other doctors think that he does not. The ALJ's determination that he does not is supported by substantial evidence.

Pirtle asserts that the ALJ was bound to find that he had a severe impairment of his right arm because he met the "pain standard." Pirtle cites *Carradine v. Barnhart*, 360 F.3d 751 (7th Cir. 2004), but fails to correctly apply it to his case. In *Carradine*, the Seventh Circuit stated that "once the claimant produces medical evidence of an underlying impairment, the Commissioner may not discredit the claimant's testimony as to subjective symptoms merely because they are unsupported by objective evidence." *Carradine*, 360 F.3d at 753 (internal citation omitted). Pirtle's argument ignores the first clause of the sentence. If the Court were to accept Pirtle's position, every claimant who testified that he had pain would automatically be entitled to disability benefits regardless of the medical evidence. That is not the law. Pirtle has not met the pain standard because he has not produced credible medical evidence that he suffers from an impairment of his right arm.

Pirtle argues that the ALJ's finding that he was able to return to his past relevant work was not supported by substantial evidence. The state agency physicians found, however, that Pirtle's condition was consistent with an ability to do medium work. (Tr. 245-252) Specifically, they

found that Pirtle was able to lift 25 pounds frequently and 50 pounds occasionally. These are the exertional requirements of medium work. 20 C.F.R. § 404.1567.

In addition, Dr. Cantrell stated that Pirtle could resume his regular work duties without restrictions. (Tr. 365) Dr. Shekhani found in 2001 that Pirtle had no problems sitting, standing, or walking, that his ability to grasp and his finger manipulation were normal, and that he could handle objects up to 25 to 50 pounds. (Tr. 270) Pirtle does not dispute that his past relevant work was at the medium level. In his Disability Report, Pirtle stated that the heaviest weight he lifted on the job was 50 pounds and that he frequently lifted 25 pounds. (Tr. 110) If a claimant is able to perform the activities of his past relevant work, he is not disabled. 20 C.F.R. § 404.1520(e).

The opinions of the state agency physicians, Dr. Cantrell and Dr. Shekhani, constitute substantial evidence sufficient to support the ALJ's finding. Essentially, Pirtle's argument here is that the ALJ erred because he did not accept Dr. Schlafly's opinion that Pirtle was unable to use his right hand for work because of carpal tunnel syndrome. The Court has already explained why the ALJ's rejection of Dr. Schlafly's opinion was not erroneous. It suffices to say that there was a conflict in the medical evidence, and this Court does not reweigh evidence or decide such conflicts. *See Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003).

Lastly, Pirtle suggests that the ALJ "apparently conceded" in his second decision that his heart condition renders him no longer able to perform work at the medium level, and, therefore, he could no longer return his past work. This is a mischaracterization of the ALJ's statement. The ALJ was recognizing an obvious fact, *i.e.*, that Pirtle had a heart attack in July of 2003, three years after the disability date in the application and five years after the disability date testified to by Pirtle. The heart attack was followed by successful treatment. The ALJ stated that one could "plausibly argue"

that the residual functional capacity for medium work was no longer realistic, in view of the heart attack. The ALJ went on to state, however, that "even if" Pirtle were restricted to light or sedentary work, he would not be disabled. (Tr. 21)

The ALJ did *not* make a finding that Pirtle's heart condition renders him unable to perform the functions of medium work. He noted that Pirtle's cardiovascular condition was stable with no "real complaints of recurring or ongoing chest pain." (Tr. 20) The ALJ specifically found that Pirtle had the ability to perform his past relevant work at the medium level, and that finding is supported by substantial evidence, for the reasons already set forth.

### CONCLUSION

After careful review of the record as a whole, the Court finds that the ALJ committed no errors of law, and the findings of the ALJ are supported by substantial evidence. The final decision of the Commissioner of Social Security that Plaintiff Eugene Pirtle is not disabled and denying him a period of disability, disability insurance benefits (DIB), and supplemental security income (SSI) is **AFFIRMED.**

The Clerk of Court is **DIRECTED** to enter judgment in favor of Defendant.

**IT IS SO ORDERED.**

DATED: 09/22/05

s/ G. Patrick Murphy
G. PATRICK MURPHY
Chief United States District Judge